# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| BTC, INC., an Iowa Corporation d/b/a WESTERN IOWA NETWORKS, | |
| Plaintiff, | No. C18-3075-LTS |
| vs. | |
| AT&T CORP., a New York Corporation, | MEMORANDUM OPINION AND ORDER ON MOTION TO DISMISS CERTAIN CLAIMS |
| Defendant. | |

## I.    INTRODUCTION

This matter is before me on a motion (Doc. No. 14) by defendant AT&T Corp. (AT&T) to dismiss Counts II and III of plaintiff's complaint. Plaintiff BTC Inc. d/b/a Western Iowa Networks (BTC), has filed a resistance (Doc. No. 15) and AT&T has filed a reply (Doc. No. 16). I find that oral argument is not necessary. *See* Local Rule 7(c).

## II.    BACKGROUND

BTC filed its complaint (Doc. No. 1) on December 28, 2018, alleging that AT&T has refused to pay BTC's interstate tariffed switched access charges to transmit interstate long-distance calls to BTC customers. Doc. No. 1 at 1. It explains that switched access charges are federally-mandated charges assessed by local telephone companies like BTC on long-distance carriers like AT&T who utilize and rely on the local carrier's telecommunications network for the origination or termination of interstate long-distance telecommunications traffic. *Id.* BTC alleges the switched access services it provided were in accordance with Federal Communication Commission (FCC) rules and regulations, including federally-filed tariffs. *Id.* It alleges that the tariffs were filed in full compliance with rules adopted by the FCC on November 18, 2011, that concluded

competitive local exchange carriers (CLECs) such as BTC may tariff and assess switched access charges on long-distance carriers that terminate traffic to free conference calling providers served by the CLEC. These rules also established the reasonable switched access rates to be charged for this telecommunications traffic. *Id.* at 1-2. BTC refers to these as "access stimulation" rules and alleges they were adopted by the FCC to clarify whether tariffed access charges applied to calls made to high-volume free conference calling and similar services. BTC alleges AT&T's refusal to pay BTC the tariffed access charges violates FCC policy. *Id.* at 2. BTC relies on both federal question and diversity jurisdiction[1] and alleges that venue is proper based on AT&T's business transactions in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district. *Id.* at 3-4.

BTC provides the following background in its complaint concerning telecommunications regulation. In 1984, AT&T was split up into "local" and "long distance" companies. *Id.* at 4. Local telephone companies (LECs) maintained exclusive franchises to provide telephone service within defined geographic service territories, while the long-distance portion of AT&T faced competition from other interexchange carriers (IXCs), such as MCI, Sprint and others. *Id.* IXCs generally use their own lines to carry calls across a state or across the country. *Id.* They do not, however, own lines within the local exchanges. *Id.* These lines are owned by the LECs. To enable long-distance competition, the FCC required LECs to allow IXCs to use their local lines for purposes of "originating" and "terminating" calls. *Id.* To compensate LECs for the use of their networks, the FCC required IXCs to pay "access charges" to LECs for originating and terminating long-distance telephone calls. The charges were set forth in regulated price lists, known as tariffs, filed with the FCC (interstate long-distance calls) and state public service commissions (intrastate long-distance calls). *Id.*

---

[1] BTC submits that it is an Iowa corporation with its principal place of business in Breda, Carroll County, Iowa, and that AT&T is a New York corporation with its principal place of business in Bedminster, New Jersey. *See* Doc. No. 1 at 2.

In 1996, Congress passed the Telecommunications Act (1996 Act), which eliminated the exclusive franchises possessed by the incumbent LECs (ILECs) and preempted state statutes, regulations and other legal requirements that "prohibit or have the effect of prohibiting the ability of any entity to provide interstate or intrastate telecommunications services." *Id.* at 4-5 (quoting 47 U.S.C. § 253(a)). Congress also required all telecommunications carriers to interconnect their networks to ensure that all consumers can place and receive calls from consumers that are served by different carriers. *Id.* at 5.

BTC notes that prior to 2001, the FCC did not regulate CLEC access charges. *Id.* In 2001, it modified its rules to regulate CLEC access rates by more closely aligning them with those of the ILECs. *Id.* The FCC established a "benchmark" or "safe harbor" under which CLEC access rates are presumed just and reasonable as a matter of law. *Id.* (citing *In re Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, 16 FCC Rcd. 9923, 9924, 9938-49, ¶¶ 3, 40-63 (2001) (*CLEC Access Charge Order I*); 47 C.F.R. § 61.26). The *CLEC Access Charge Order I* stated:

> [A]n IXC that refused payment of tariffed rates within the safe harbor would be subject to suit on the tariff in the appropriate federal district court, without the impediment of a primary jurisdiction referral to the Commission to determine the reasonableness of the rate. Similarly, because of the presumptive conclusion of reasonableness that we will accord to tariffed rates at or below the benchmark, a CLEC with qualifying rates will not be subject to a section 208 complaint challenging its rates.

*CLEC Access Charge Order I*, 16 FCC Rcd. at 9948 ¶ 60. BTC alleges that many years ago, LECs recognized that an increase in traffic volumes on their networks would allow them to collect more access revenue and, in turn, provide better services to residents of rural areas. Thus, they began to compete for customers that received high volumes of calls, such as free conference calling services. Doc. No. 1 at 6.

In approximately 2008, AT&T and other IXCs filed disputes with state utility commissions, the FCC, and in various federal courts alleging it was unjust and

unreasonable for LECs to be paid full access charges for traffic going to these high-volume services. They failed to convince regulators to prohibit free conference calling services or to prevent LECs from assessing tariffed access charges on these calls. *See Connect America Fund Order*, ¶¶ 672, 674. On November 18, 2011, the FCC struck a compromise, adopting the *Connect America Fund Order*, specifically permitting LECs to engage in "access stimulation," but requiring LECs that provided service to high-volume customers to reduce their rates to match the rates of the largest "price cap" ILEC in the state. Doc. No. 1 at 6.

BTC participates as an issuing carrier in a tariff identified as Kiesling Associates LLP Tariff FCC No. 2 (the Kiesling Tariff). *Id.* at 7. It contends its tariffed interstate access rates are fully consistent with the requirements of the *Connect America Fund Order*. The Kiesling Tariff benchmarks BTC's tariffed rates to the "price cap" ILEC in Iowa (CenturyLink) as required by the *Connect America Fund Order*. BTC contends that despite being billed for and receiving services in accordance with that order and the rules established by the FCC, AT&T has refused to pay BTC for the switched access services it has provided. According to BTC, AT&T's unpaid balance exceeds $2.2 million, not including accrued late fees that are allegedly due pursuant to the Kiesling Tariff. *Id.* BTC alleges that additional damages accrue daily as AT&T continues to withhold amounts due. *Id.* Finally, BTC argues that while AT&T refuses to pay the lawful tariffed switched access charges, it nevertheless continues to bill and collect payment from retail and wholesale clients for the delivery of calls to BTC's networks. *Id.* BTC alleges AT&T has generated significant profit by terminating long-distance calls to the high-volume conference call providers served by BTC while refusing to compensate BTC for the work it does completing the calls on behalf of AT&T.

BTC alleges the following claims against AT&T:

- Count I – Collection Action Pursuant to Federal Tariffs
- Count II – Quantum Meruit

- Count III – Unjust Enrichment
- Count IV – Declaratory Judgment

*Id.* at 8-10.  It seeks damages for an amount to be determined at trial, but no less than the access charges that AT&T owes, together with late fees and prejudgment interest, a preliminary and permanent injunction barring AT&T from continuing to engage in such conduct and directing it to pay access charges in the future pursuant to BTC's federal tariff in addition to attorneys' fees and costs.  *Id.* at 11.

## III.   APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid*.  Where a complaint pleads facts

5

that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am., Inc.*, 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

Preemption generally involves a question of law, and thus, may be decided at the pleadings stage. *See Brinkley v. Pfizer, Inc.*, 772 F.3d 1133, 1139 (8th Cir. 2014) (affirming dismissal of implied warranty and design defect claims as preempted by the FDCA on a motion for judgment on the pleadings). Preemption arises under the Supremacy Clause, which "states that the laws of the United States made pursuant to the Constitution are the 'supreme Law of the Land.'" *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005) (quoting U.S. Const., art. VI). "Thus state law that conflicts with federal law has no effect." *Jones v. Vilsack*, 272 F.3d 1030, 1033 (8th Cir. 2001) (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). There are three types of preemption – express, field and conflict preemption. *Id.* Express preemption occurs when Congress expressly forbids state regulation. *Id.* Field preemption occurs when Congress "creates a scheme of federal regulation so pervasive that the only reasonable inference is that it meant to displace the states." *Id.* Conflict preemption occurs "when a law enacted by [Congress] directly conflicts with state law." *Id.* Aside from statutes, agency regulations may also preempt conflicting state requirements as long as the agency is "acting within the scope of its congressionally delegated authority." *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 18 (2002) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). In determining whether federal law preempts state law, I must consider Congress intent, which has been described as the "ultimate touchstone" of preemption analysis. *Jones*, 272 F.3d at 1033 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

## IV.    ANALYSIS

### A.    Parties' Arguments

AT&T seeks to dismiss BTC's state law claims of quantum meruit and unjust enrichment (otherwise referred to as quasi-contract claims) because these claims conflict

with the Communications Act and the FCC's regulatory regime for switched access services. Doc. No. 14-1 at 7. It relies on *CallerID4u, Inc. v. MCI Commc'ns Servs.*, 880 F.3d 1048, 1052 (9th Cir. 2018) and cites various other district court cases that have relied on that case in dismissing state law quasi-contract claims. *See* Doc. No. 14-1 at 2, 10-11. AT&T argues that allowing BTC's state law claims to proceed would undermine the FCC's regulatory regime. *Id.* at 12.

BTC relies on *Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683 (8th Cir. 2004) (*INS I*), and *Iowa Network Servs, Inc. v. Qwest Corp.*, 466 F.3d 1091 (8th Cir. 2006) (*INS II*), to argue that I must first decide whether its tariff encompasses the telecommunications traffic at issue. Doc. No. 15 at 6. It argues I should reserve judgment on its alternative state law claims until the court (or a jury) decides whether BTC's tariff applies. *Id.* at 7. If the tariff applies, then BTC acknowledges the state law claims are moot. It contends I should not dismiss the alternative state law claims before reaching that issue to avoid a significant windfall to AT&T. *Id.* BTC notes that this approach was used in *N. Valley Commc'ns, L.L.C. v. AT&T Corp.*, 1:14-CV-01018-RAL, 2015 WL 11675666 (D.S.D. Aug. 20, 2015). BTC adds that the *Northern Valley* court considered whether allowing the CLEC to pursue its state law claims would conflict with the FCC's objectives and found no such conflict. Doc. No. 15 at 8. Additionally, it points out that several district courts in this circuit have referred the question to the FCC of whether alternative state law recovery is available in the event the tariff does not apply. *Id.* at 10 (citing cases). Finally, BTC address *CallerID4u* and the district court cases relying on that opinion, arguing that *CallerID4u* was wrongly decided.

The key issue identified by the parties is whether BTC (as a CLEC) may seek equitable relief under state law for access services it provided to AT&T or whether it is limited to seeking relief under its filed tariff or an express contract. In analyzing this question, I must consider whether allowing BTC to pursue its state law quasi-contract claims would conflict with FCC's regulatory regime.

8

## B.      Relevant Case Law and Regulatory Background

As the parties recognize, the regulatory background of telecommunications and access stimulation litigation has been covered extensively by other courts.  *See e.g.*, *AT&T Corp. v. Aventure Comm'cn Tech., LLC*, 207 F. Supp.3d 962, 967-1004 (S.D. Iowa 2016); *CallerID4u, Inc.*, 880 F.3d at 1055-1060.  As such, I will keep my summary short and elaborate further in discussing the cases the parties cite.

The Communications Act of 1934 (the Communications Act) gave the FCC "broad authority to regulate interstate telephone communications.  *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007); 47 U.S.C. §§ 151 *et seq*.  Congress authorized the FCC to issue rules to enforce the Communications Act, including how carriers such as BTC may receive compensation for interstate switched access services.  *See* 47 U.S.C. §§ 201(b), 203; *MCI Telecomms. Cop. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 220 (1994) (stating that the Communications Act "authorized the [FCC] to regulate the rates charged for communication services to ensure that they were reasonable and nondiscriminatory.").  As things currently stand, the FCC has determined that "until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts with IXCs for the access services it intends to provide, it lacks authority to bill for those services."  *AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477, ¶ 37 (2013).

BTC relies on *INS I* and *INS II* to support the legitimacy of its state law quasi-contract claims.  In *INS I*, the Eighth Circuit reviewed the dismissal of Iowa Network Services' unjust enrichment claim.  *INS I*, 363 F.3d at 694.  It noted that the district court dismissed the claim because the Iowa Utilities Board (IUB) had determined that the traffic at issue was local and not subject to access charges.  *Id*.  The district court reasoned that Qwest was not a beneficiary of INS's services because it served as the intermediary between a cell phone user's Commercial Mobile Radio Service (CMRS) provider and INS's network.  In other words, Qwest was not acting as a typical IXC because it did not have a relationship with either the calling or the called parties in the traffic at issue.  *Id*.

9

at 688. The Eighth Circuit remanded for the district court to decide for itself whether the traffic was subject to access charges pursuant to INS's tariffs rather than rely on the IUB determination. It did note, however, that if INS's claim was covered by a tariff or express contract, its unjust enrichment claim would fail under Iowa law. *Id.* at 694-95.

On remand, the district court concluded on Qwest's motion for summary judgment that INS's federal tariff did not apply to the traffic at issue and that INS's unjust enrichment and quantum meruit claims failed as a matter law. *INS II*, 466 F.3d at 1094. The traffic was either "[i]nterstate and foreign" traffic subject to the filed rate doctrine[2] or intrastate traffic meaning it originated and terminated within the local calling area. The court determined it was the latter. *See INS I*, 363 F.3d at 687 ("This case involves traffic which occurs when a cell phone user located within the Des Moines [Major Trading Area] initiates a call to a land-line customer of one of the Iowa independent LECs, and the cell phone user's CMRS provider uses Qwest's network to transport the call to INS's network for final termination on the LEC's infrastructure to the called party."). Because INS's tariff did not apply to this local traffic, the determination of how such traffic should be charged fell to the IUB under the 1996 Act, rather than the federal tariff. *INS II*, 466 F.3d at 1097. The IUB determined that reciprocal compensation agreements control this type of traffic and that the parties should negotiate or arbitrate these agreements. *Id.* at 1096. The district court agreed. The Eighth Circuit concluded the IUB acted within its authority in directing INS and Qwest to negotiate within the reciprocal compensation regime. *Id.* at 1098. Because this would ultimately result in an express contract and INS conceded it could not prevail on its claims of unjust enrichment and quantum meruit when an express contract governed those issues, the Eighth Circuit affirmed the dismissal of those claims. *Id*

---

[2] The filed rate doctrine provides that "once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *INS II*, 466 F.3d at 1097 (quoting *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000)).

In *CallerID4u*, the CLEC provided telecommunications services to AT&T and Verizon. Unlike the CLEC in this case or *INS*, it did not have a tariff or a contract in place governing these services. *CallerID4u, Inc.*, 880 F.3d at 1051-52. As such, it relied on state law equitable principles to recover the value of the services rendered. *Id.* at 1052. The Ninth Circuit affirmed the district court's dismissal of these claims, concluding that it was subject to the tariff-filing requirements of Section 203 of the Communications Act because it did not have a negotiated agreement and its state law equitable claims were preempted under Section 203. *Id.* In reaching this decision, the court explained that "[i]t has long been established that the tariff requirement of § 203 preempts state law." *CallerID4u, Inc.*, 880 F.3d at 1053. Section 203(a) states in part:

> Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules[3] showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication between the different points on its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other carrier subject to this chapter when a through route has been established, whether such charges are joint or separate, and showing the classifications, practices, and regulations affecting such charges.

47 U.S.C. § 203. Section 203(c) provides in relevant part:

> No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce

---

[3] Otherwise known as "tariffs." *See Am. Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 221 (1998).

> any classifications, regulations, or practices affecting such charges, except
> as specified in such schedule.

47 U.S.C. § 203(c). Together, these sections provide that a common carrier must have a tariff on file showing all charges for interstate and foreign communication and is prohibited from charging outside the filed tariff. This is otherwise described as the "filed rate doctrine," in which "the rate of the carrier duly filed is the only lawful charge." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 22 (1998). The Ninth Circuit explained that section 203 and the filed rate doctrine "preempts state law claims that conflict with the rate-setting authority of the FCC." *See CallerID4u, Inc.*, 880 F.3d at 1053-55.

The Ninth Circuit then turned to the regulation history of common carriers engaged in telecommunications services. *See id.* at 1055-60. A couple of highlights in this lengthy history include the 1996 Act, in which Congress "gave the FCC authority to forbear from enforcing § 203's tariff-filing requirements if the FCC determined that (1) enforcement was not necessary to ensure that the common carriers' charges were just and reasonable, (2) enforcement was not necessary to ensure that consumers were protected, and (3) forbearance was 'consistent with the public interest.'" *Id.* at 1057 (quoting 47 U.S.C. § 160(a)). Pursuant to this authority, the FCC mandated that all non-dominant IXCs be detariffed and prohibited them from filing tariffs. *Id.* at 1057. In this detariffed environment, the Ninth Circuit found no conflict between state and federal law and concluded that "§ 203 and the filed rate doctrine, which 'rested entirely on the filing requirement of § 203, did not apply and that other provisions of the Communications Act did not preempt state law claims regarding the rates charged by completely detariffed IXCs. *Id.* at 1058 (quoting *Ting v. AT&T*, 319 F.3d 1126, 1142-46 (9th Cir. 2003)). The Ninth Circuit acknowledged there is a circuit split on whether the Communications Act preempts state law in a completely detariffed environment. *Id.* n.5 (citing cases from the Seventh Circuit).

Unlike the IXCs, the FCC did not impose mandatory detariffing on the CLECs. *Id.* Rather, it made CLECs subject to the § 203 filing requirement unless they entered into negotiated agreements with IXCs. *Id.* (citing *Hyperion Telecomms., Inc. Petition Requesting Forbearance*, 12 FCC Rcd. 8596, 8608 (1997)). This permitted the FCC to forbear from requiring CLECs to file tariffs if they had entered into negotiated agreements. *Id.* CLECs filing tariffs faced no limitations on the amount they could charge. This led to high switched access rates that were "subject neither to negotiation nor to regulation designed to ensure their reasonableness." *Id.* (citing *CLEC Access Charge Order I*, 16 FCC Rcd. at 9924-25).[4] In the *CLEC Access Charge Order I*, the FCC established a "benchmark" level for CLEC rates "based on the rates charged by the ILEC or ILECs operating in a CLEC's service area." *Id.* at 1059 (citing *CLEC Access Charge Order I*, 16 FCC Rcd. at 9938, 9941). The FCC also decided it would exercise its forbearance authority "only for those CLEC interstate access services for which the aggregate charges exceed our benchmark" meaning that CLECs seeking to charge rates above the benchmark had to negotiate agreements with the IXCs. *Id.* (quoting *CLEC Access Charge Order I*, 16 FCC Rcd. at 9957). In sum, a CLEC has two options for charging an IXC for interstate access services: (1) file a tariff with rates no higher than the rates charged for such services by the ILEC in the service area or (2) negotiate and enter into an agreement with an IXC to charge a higher rate. *Id.* (citing *AT&T Servs. Inc. v. Great Lakes Comnet. Inc.*, 30 FCC Rcd. 2586, 2588-89 (2015)).

AT&T then filed a formal complaint with the FCC against CLECs alleging violations of § 203 and § 201(b) of the Communications Act by billing AT&T for switched access services without valid and applicable interstate tariffs or negotiated agreements and engaging in access stimulation, resulting in unjust and unreasonable charges in violation of § 201(b). *Id.* (citing *AT&T Corp. v. All Am. Tel. Co.*, 28 FCC

---

[4] The *CallerID4u* court referred to this order as the *Access Reform Order*. This is the same order BTC refers to in the complaint as the *CLEC Access Charge Order I*. I will continue to refer to it by that name to avoid confusion.

Rcd. 3477, 3480-84, 3492-93 (2013) (*All American II*).  The FCC agreed and reiterated that CLECs could not bill for access services without a valid interstate tariff or a negotiated agreement with the IXC.  *Id.* (citing *All American II*, 28 FCC Rcd. at 3494).  In the damages phase of *All American II*, the CLECs argued unjust enrichment because AT&T had already received "in excess of $11 million worth of terminating switched access services."  *Id.* at 1060 (quoting *AT&T Corp. v. All Am. Tel. Co.*, 30 FCC Rcd. 8958, 8962 (2015) (*All American II Damages*)).  The FCC concluded because CLECs were entitled to compensation for access services only under a valid tariff or contract they could not "seek equitable relief relating to matters subject to regulation."  *Id.* (quoting *All American II Damages*, 30 FCC Rcd. at 8963).  On appeal, the D.C. Circuit determined that the FCC "lacked the legal authority to discuss the merits of their state-law quantum meruit claims" because the FCC was vested only with authority to address allegations under the Communications Act.  *Id.* (quoting *All Am. Tel. Co., Inc. v. FCC*, 867 F.3d 81, 94 (D.C. Cir. 2017) (italics omitted)).  The D.C. Circuit vacated that portion of the FCC's *All American II Damages* Order and concluded that the merits of the CLEC's state law claims had to be decided by the district court in the first instance.  *Id.* (citing *All Am. Tel. Co., Inc.*, 867 F.3d at 95).

In *CallerID4u*, the Ninth Circuit reviewed the district court's dismissal of CallerID4u's state law claims of quantum meruit and unjust enrichment.  The court performed a preemption analysis and, in doing so, noted that it was required to presume the validity of FCC regulations, rules, and orders that are currently in effect based on the Hobbs Act, 28 U.S.C. § 2342, which "requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals."  *CallerID4u*, 880 F.3d at 1061-62.[5]  Because the case did not come before the court through an original

---

[5] BTC argues the court is not required to follow the FCC *All American* decisions based on the Hobbs Act.  It cites *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, in which the

petition, it presumed the validity of FCC regulations, rules and orders. The court first analyzed whether CallerID4u was permissively detariffed. *Id.* at 1062. It concluded that pursuant to the *Access Reform Order* and *All American II*, because CallerID4u did not negotiate any agreements with IXCs, it was subject to § 203's tariff-filing requirements. *Id.*

> In turning to the state law claims, the court reasoned:

> Allowing carriers to seek compensation through state law equitable principles would interfere with Congress's goals whether or not the carrier neglected to file a tariff. First, CLECs that do not negotiate contracts are subject to § 203 and the FCC's requirement that they file tariffs charging no more than the benchmark rate. If CLECs that failed to negotiate a contract could bring legal actions under state law, CLECs could receive different rates either because different state equitable principles applied or because different courts weighed the equities differently, thus defeating Congress's uniformity goals.

*Id.* It also reasoned that "[r]elieving CLECs of their obligation to file a tariff under § 203 if they fail to negotiate an agreement would create an incentive for CLECs to neither negotiate an agreement nor file a tariff, knowing they could bring state law equitable

---

Supreme Court recently considered "[w]hether the Hobbs Act required the district court in this case to accept the FCC's legal interpretation of the Telephone Consumer Protection Act." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019). The court remanded the case to the Court of Appeals to consider the legal nature of the FCC's order and whether PDR had a "prior" and "adequate" opportunity to seek judicial review of the Order. *Id.* at 2055-56. Under current precedent, I find it appropriate to presume the validity of the FCC *All American* decisions. BTC also argues I should not defer to FCC statements in the *All American* decisions because it was not a party to those proceedings and the FCC cannot use private adjudicatory proceedings to announce new or different interpretations of prior orders. Doc. No. 15 at 18, n.6 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)). The *Kisor* court rejected this argument, noting that 5 U.S.C. § 553(b)(A) allows agencies to issue "interpret[ive]" rules without notice and comment. *Kisor*, 139 S. Ct. at 2420. *See also Conf. Grp., LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013) ("The fact that an order rendered in an adjudication 'may affect agency policy and have general prospective application . . . does not make it rulemaking subject to APA section 553 notice and comment.") (internal citations omitted); *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999) ("the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal.").

claims instead." *Id.* at 1064. It concluded "that the preemptive effect of the filed rate doctrine precludes [the local carrier] from recovering damages under a theory of unjust enrichment or quantum meruit" and affirmed the dismissal of these claims. *Id.* at 1065-66.

## C.    *BTC's Claims of Unjust Enrichment and Quantum Meruit*

Under Iowa law, a plaintiff must show the following to recover under a claim of quantum meruit: (1) plaintiff performed under circumstances reasonably indicating the performance was for the benefit of defendant and not another person; (2) plaintiff performed under circumstances reasonably indicating payment was expected; and (3) the services provided by the plaintiff were beneficial to the defendant." *Iowa Networks Servs., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850, 910 (S.D. Iowa 2005), *aff'd*, 466 F.3d 1091 (8th Cir. 2006). A claim for unjust enrichment under Iowa law is comprised of the following three elements: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001).

Here, BTC alleges that it has billed AT&T for switched access services in accordance with the Kiesling Tariff and is pursuing a collection action under the tariff described in Count I. *See* Doc. No. 1 at 7. Nonetheless, it argues that its alternative claims of unjust enrichment and quantum meruit should not be dismissed until it has been established that the services at issue definitively fall within the tariff. If the services fall outside of the tariff, BTC contends it should be allowed to pursue its state law claims. It cites *N. Valley Comm'cns, L.L.C.* in support.

In that case, the court reasoned that the text of the FCC rule limiting compensation through either a tariff or negotiated contract appeared to be limited to access services. *N. Valley Comm'cns, L.L.C.*, 2015 WL 11675666 at *5. Thus, it stated "if Northern Valley's services are not access services, then they not only fall outside the tariff as

AT&T claims, but also fall outside the scope of the FCC rule limiting the methods by which a CLEC may charge." *Id.* It found that the state equity claims would not interfere with FCC's authority to set reasonable rates because there did not appear to be any FCC regulation that would characterize the type of service outside a tariff or contract or one that would regulate its pricing. *Id.* at *6. It also reasoned that collection actions based on state equity claims are "distinct from rate-setting, because rate-setting looks at what a carrier may charge prospectively while the equity claims only address services provided in the past and would have no prospective rate-setting effect." *Id.*

The court in *All Am. Tel. Co., Inc. v. AT&T Corp.*, 328 F. Supp. 3d 342, 367 (S.D.N.Y. 2018), considered a similar argument in which All American also relied on *N. Valley Comm'cns, L.L.C..* It noted that is now well-established in decisions by the FCC and federal courts that "absent a negotiated contract, CLECs remain subject to § 203 and the filed rate doctrine." *All Am. Tel. Co., Inc.*, 328 F. Supp. 3d at 367 (citing *CallerID4u, Inc.*, 880 F.3d at 1062-63). It also reasoned that *N. Valley Comm'cns* "says little about whether the FCC's tariff regime bars all *alternative* means of compensation for services not covered by a tariff (or contract)." *Id.* It stated:

> In short, the fact that a CLEC's access services fall outside a filed tariff does not necessarily bring it outside the FCC's regulatory purview. Rather, CLECs may charge an interexchange carrier for access services *only* through a negotiated contract or a valid filed tariff. If a CLEC wishes to charge a higher rate than the benchmark or for services to non-paying end users, the FCC requires that it do so through a negotiated contract.

*Id.* The court determined that AT&T was entitled to judgment as a matter of law based on the preemption of plaintiffs' state law claims. *Id.* at 368.[6]

BTC's argument that its state law claims should not be dismissed until it is determined whether the services provided to AT&T fall under the tariff is without merit.

---

[6] This case was appealed, but the appeal subsequently withdrawn pursuant to a stipulation by the parties. *See* Order, *All Am. Tel. Co., Inc. v. AT&T Corp.*, Case No. 18-2838 (2d Cir. December 28, 2018) ECF No. 35.

The applicable FCC orders and case law on this issue clearly provide that a CLEC may be compensated for services only under a tariff or a negotiated contract. If BTC's services fall outside the tariff and are not covered by a negotiated contract, BTC is not entitled to recovery for those services. To allow recovery under state law for such services would indirectly interfere with FCC's authority to regulate rates for such services. As the court explained in *All Am. Tel. Co., Inc.*:

> Allowing Plaintiffs to recover under quasi-contractual theories in the absence of a negotiated agreement would circumvent the filed rate doctrine and FCC rulings in two ways. First, it is tantamount to the imposition of access charges by judicial fiat for services that do not comply with filed tariffs. Second, it effectively requires this Court to determine a reasonable rate for the access services Plaintiffs billed AT&T under their tariffs . . . . In a similar vein, permitting CLECs to obtain compensation outside of a tariff or a negotiated agreement undermines congressional goals of uniformity because "CLECs could receive different rates either because different state equitable principles applied or because different courts weighed the equities differently." *CallerID4u, Inc.*, 880 F.3d at 1063. Valid tariffs and negotiated agreements ensure reasonable rates via the benchmarking rule or competitive market forces – state law equitable claims implicate neither. Because there is no other means of compensation other than by negotiated agreement or the FCC's regulatory regime, Plaintiffs' Second Amended Complaint must be dismissed.

*All Am. Tel. Co., Inc.*, 328 F. Supp. 3d at 365-66 (internal citations omitted).

Here, BTC has acknowledged that it has a filed tariff, meaning it is precluded from negotiating a separate agreement.[7] *See AT&T Corp.*, 207 F. Supp. 3d at 1029

---

[7] BTC argues that because CLECs are given the option to receive payment for their access services via contract (governed by state law), the FCC "never foreclosed the additional, complementary modes of recovery that exist to avoid injustice." *See* Doc. No. 15 at 13. This argument is without merit because it confuses the rate-setting requirements (tariff or negotiated contract) with how those requirements will be interpreted. Moreover, the FCC has expressly stated: "A CLEC generally may tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing ILEC (the benchmaking rule). Alternatively, a CLEC must negotiate and enter into agreements with IXCs to charge rates higher than those permitted under the benchmarking rule." *All American I*, 28 FCC Rcd. at 3480.

("once a CLEC files a tariff, a CLEC may not then negotiate separate contracts for interstate access."). It has also alleged that it provided AT&T with switched access services pursuant to the tariff. *See* Doc. No. 1 at 1 ("The switched access services received by AT&T were provided in accordance with the rules and regulations established by the [FCC], including federally-filed tariffs."). This makes *N. Valley Comm'cns* factually distinguishable from this case, but as the District of South Dakota pointed out in a later case, the reasoning in *N. Valley Comm'cns* that any non-switched access services may be compensated by any means outside of a tariff or negotiated contract has been rejected by subsequent FCC decisions.[8] *See Midcontinent Comm'cns v. MCI Comm'cns Servs., Inc.*, 4:16-CV-04070-KES, 2016 WL 6833944, at *3 (D.S.D. Nov. 18, 2016) ("So not only is *Northern Valley* distinguishable from this case, but the later decision in *All American [II Damages]* contradicts the reasoning Midco relies on in its brief.").

BTC relies on old precedent, all pre-dating the FCC's *All American* decisions, confirming the two exclusive means of compensation for switched access services: through a tariff or negotiated contract. *See* Doc. No. 15 at 11-12. To the extent BTC relies on the FCC's forbearance authority, I agree with AT&T that that did not leave a third option available – recovery through state law quasi-contract claims. As the Ninth Circuit noted in *CallerID4u*, the FCC exercised its forbearance authority to detariff the IXCs, not the CLECs. *See CallerID4u*, 880 F.3d at 1063. With regard to the CLECs, the FCC would forbear only from requiring them to file tariffs if they had entered into negotiated agreements. *Hyperion Telecomms., Inc. Petition Requesting Forbearance*, 12 FCC Rcd. at 8608. Because BTC alleges that its rates are established through a tariff

---

[8] Since the D.C. Circuit determined that it was outside the FCC's jurisdiction to address state law claims of quantum meruit and unjust enrichment, *see All Am. Tel. Co., Inc.*, 867 F.3d at 95, the Ninth Circuit is the first appellate court to address this issue and its decision has been followed by numerous district courts. BTC has failed to cite a case in which state law claims have survived a preemption challenge post the *All American* decisions.

and does not allege that it has a negotiated agreement with AT&T, the FCC's forbearance authority is inapplicable to this case.

The Eighth Circuit decisions in *INS I* and *INS II* also do not apply, as the issue in those cases was whether the services provided were solely intrastate rather than interstate. *See INS I*, 363 F.3d at 686; *INS II*, 466 F.3d at 1096. Moreover, the quasi-contract claims in that case were dismissed on summary judgment because there was an express contract covering the same subject matter. *Id.* As alleged by BTC, the services at issue in this case are access services billed on interstate calls and under BTC's tariff.

Finally, BTC has not cited any cases in which the FCC or a court has entered judgment allowing a CLEC to recover for access charges based on state law quasi-contract grounds. Nor have I been able to locate any such case. There are, however, numerous cases dismissing state law quasi-contract claims in recognition that they conflict with the regulatory regime allowing access service charges to be recovered only through tariff or negotiated contract. *See AT&T Corp. v. Aventure Comm'cn Tech., LLC*, 4:07-CV0043-JEG, 2018 WL 4278501, at *4-7 (S.D. Iowa July 11, 2018) (confirming that Aventure's claims for quantum meruit and unjust enrichment should remain dismissed following the *All American II Damages* order and the D.C. Circuit's opinion in *All Am. Tel. Co., Inc.*, 867 F.3d at 81); *Midcontinent Comm'cns*, 2016 WL 6833944, at *3 ("Thus, if Midco did provide Verizon services that are not covered under the parties' tariff and accompanying Switched Access Agreement, then Midco violated the Communications Act and it cannot charge Verizon for those services."); *All Am. Tel. Co., Inc.*, 328 F. Supp. 3d at 365 ("Applying these principles here, this Court concludes that Plaintiffs' state law claims are preempted. As the FCC found, Plaintiffs negotiated no agreement with AT&T – though they certainly could have . . . . Therefore, they were subject to § 203 and the filed rate doctrine. And once Plaintiffs filed their tariffs, those tariffs provided the only means of compensation for any access services.") (citation omitted). I agree with the reasoning expressed in these cases that state law claims of quantum meruit and unjust enrichment are preempted under these circumstances.

Because BTC has alleged it charged AT&T for access services through its tariff, it may recover any unpaid charges only through the tariff.  To hold otherwise would obfuscate the filed rate doctrine.

## V.    CONCLUSION

For the reasons stated herein, AT&T's motion (Doc. No. 14) to dismiss Counts II and III of BTC's complaint is **granted**.

**IT IS SO ORDERED.**

**DATED** this 3rd day of September, 2019.

_____
Leonard T. Strand, Chief Judge